**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 06 C 210** |
| | ) | |
| **ANCHOR MORTGAGE CORP.** | ) | |
| **and JOHN MUNSON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The United States has sued Anchor Mortgage Corporation and John Munson, its

former president, under the False Claims Act (FCA), 31 U.S.C. § 3729. The

government alleges that Anchor violated the FCA by knowingly providing false

information to the Department of Housing and Urban Development (HUD) in connection

with applications for home mortgage loans to be insured by the Federal Housing

Administration (FHA). The government also alleges that Anchor and Munson violated

the FCA by paying an unrelated real estate company fees for referring borrowers to

Anchor and falsely certifying in applications for FHA-insured loans that no such fees

had been paid.[1]

The Court previously denied the government's motion for summary judgment.

*See United States v. Anchor Mortgage Corp.,* No. 06 C 210, 2010 WL 1882018 (N.D.

---

[1] The government's complaint in this case also includes two common law fraud
claims, but the government dropped them at the time of trial.

Ill. May 10, 2010).  The same decision describes the procedural history of the case.  *Id.* at *1-3.

The Court conducted a two-day bench trial on July 9 and July 23, 2010.  This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## Facts

HUD is a federal agency that, through the FHA, provides mortgage insurance to qualified private lenders.  HUD/FHA-approved lenders make mortgage loans that are FHA-insured to qualified buyers who are unable to make a large down payment.  Some HUD-approved lenders participate in HUD/FHA's direct endorsement program, which allows them to close and underwrite HUD/FHA insured loans before final acceptance by HUD/FHA.  Other lenders submit loan applications to HUD/FHA for approval.

John Munson began his career in the mortgage industry in 1989 as a loan officer and branch manager of a company called American Frontiers.  In 1992, he started his own mortgage brokerage firm, Anchor, which obtained mortgage loans for customers.  Anchor's business expanded to seven offices and approximately seventy-five employees.  In the mid-1990's, Anchor became a mortgage bank, meaning that it funded its own mortgage loans.  In the ensuing years, Anchor opened more offices and had as many as 150 employees.  Anchor's business took a nosedive after this lawsuit was filed, and the company is now defunct.

Anchor submitted applications for FHA-insured loans to HUD for approval.  It also participated in HUD/FHA's direct endorsement program.  When it acted as a direct

endorser, Anchor was required to follow HUD regulations and other laws that govern mortgage lending. Anchor derived its income from processing fees, origination fees, and yield spread premiums that it earned when making or brokering loans, and also by pooling mortgages and selling them to the FHA or secondary market lenders.

After Munson started Anchor, Alfredo Busano, another loan officer who had worked at American Frontiers, came to work for Anchor. Busano became an Anchor loan officer, and from 1994 through 2001, he managed the company's office in Elgin, Illinois. As manager, Busano performed administrative duties and hired and recruited new loan officers, and he also continued working as a loan officer. Anchor paid him a monthly base salary, which was then netted against commissions he made from loans he and others at the Elgin office had originated. From time to time, Busano submitted expense reports to the company's accountant, Jeffrey Stack, for reimbursement. For instance, as office manager, Busano would receive reimbursements for office supplies. In his work as a loan officer, Busano had to pay up front the fee for appraising the home to be purchased but was reimbursed if the loan closed.

## A.  Customers referred to Anchor by Gordon Nelson

Busano first met Gordon Nelson, a home builder, when Busano and his wife were looking to purchase a new home. At the time, Nelson did business through a company called Lifetime Homes. Later he also did business through companies called Century Homes and Builders Funding, Inc.

After Busano went to work for Anchor, he contacted Nelson to seek customer referrals. At first, the customers that Nelson referred to Anchor were prospective

buyers of newly constructed homes.  Eventually, Nelson started purchasing and reselling foreclosed homes and would refer prospective buyers of those homes to Anchor as well.

In 1996, in connection with his sale of foreclosed homes in a development called Candlewood Lakes, Nelson asked Busano about the options available to borrowers who lacked sufficient funds for the down payment required for FHA-insured loans. Busano understood at the time that HUD/FHA rules did not permit parties involved in a home sale – such as realtors, builders, or sellers – to provide the buyer with any part of the down payment.  Busano told Nelson that FHA rules provided only three options.  A buyer could do repair work on the home and get a "sweat equity" credit that would apply toward the down payment.   A seller could contribute toward the buyer's down payment through a non-profit agency, but this would involve additional costs and more documentation.  Busano also told Nelson that FHA guidelines allowed a buyer to receive a gift from a relative that could be used toward the down payment.  Nelson requested a copy of HUD/FHA's gift guidelines, and Busano sent them to Nelson's office.

On a number of occasions after this conversation, between 1996 and 1999, buyers purchasing Nelson's foreclosed homes in Candlewood Lakes contacted Anchor Mortgage to obtain financing.  Busano testified credibly that buyers told him that they had gotten money for their down payment from Nelson.  Busano also testified credibly that he learned from others who worked for Nelson that he had provided down payment funds to buyers of Candlewood Lakes homes.  In addition, Nelson and his employees would frequently call Anchor to ask for the exact amount needed for the three percent

down payment required under FHA rules, which confirmed Busano's belief that Nelson was providing buyers with down payment funds.

A number of the loan files that Anchor submitted to HUD to obtain approval for FHA insurance included a gift letter, on a HUD-approved form, stating that down payment funds had come from a relative of the buyer. Busano testified credibly that in connection with loans to buyers referred by Nelson or his company, he knew these statements were false. Busano also testified credibly that he knew gifts by Nelson to home buyers for their down payments were prohibited by FHA rules.

Bob and Lisa Kaplan were also home buyers whom Nelson referred to Busano to obtain a loan. In 1998, Nelson and the Kaplans called Busano, asking to pre-qualify their loan for FHA approval. Based on the information they provided to him, Busano said the Kaplans would qualify. Busano met with the Kaplans later the same day to complete their loan application. When Busano reviewed the Kaplans' income tax returns at his office, he realized that the return listed Bob Kaplan's gross income from self-employment, not his net income. Busano explained to the Kaplans that FHA approval would depend on his net income. Based on Busano's review of the tax returns, he told the Kaplans that he believed their net income would be insufficient to qualify for an FHA-insured loan. The Kaplans were upset by this, and they called their accountant from Busano's office. Busano heard Bob Kaplan inform his accountant that they had not qualified for a loan, and he heard Kaplan discuss with the accountant the possibility of amending his tax return. Two or three weeks later, the Kaplans returned to Busano with amended tax returns. Based on the new tax returns, the Kaplans qualified for an FHA-insured loan, and Busano submitted their paperwork to HUD.

Busano pled guilty to a charge of mail fraud in connection with his work at Anchor. Nelson also entered a guilty plea to a mail fraud charge. Nelson died prior to trial. The Court admitted into evidence, with some redactions, his plea agreement and the transcript of his guilty plea colloquy before Judge Ruben Castillo.

In the plea agreement, Nelson admitted that between 1996 and 1999, he provided down payments to over twenty home buyers whom he referred to Busano at Anchor and instructed the buyers to conceal the source of the down payments via false gift affidavits. Nelson admitted that he would get information from Busano about the amount each buyer would need to qualify for an FHA-insured mortgage. Nelson also admitted that he was aware that Busano was concealing from HUD the source of the down payments and the falsity of the affidavits. Nelson also admitted that he knew HUD rules did not permit someone like him to be the source of a buyer's down payment for an FHA-insured mortgage. Nelson's plea agreement identified thirteen specific properties on which FHA-insured loans made from 1997 through 1999 based on false gift affidavits or other information he knew was false. They include the Candlewood Lakes properties at issue in this case. About half of the home buyers defaulted. When Nelson appeared before Judge Castillo, he affirmed under oath the veracity of his statements in the plea agreement.

**B.    Mortgage business referred to Anchor by Casa Linda**

Casa Linda Realty, a real estate company, referred home buyers to Anchor to obtain loans. In 1997 or 1998, Monica Holderby, an Anchor loan officer, discussed with Busano the possibility of paying Casa Linda for referrals. Busano told her that he would

have to talk to Munson.[2]  Munson and Busano then had a discussion about paying

Casa Linda referral fees.  At the time, both Busano and Munson knew that the law

prohibited payment of a referral fee to an entity like Casa Linda in connection with an

FHA-insured loan.  Both men understood that it was legally permissible to pay such

fees as part of a "controlled business arrangement" (CBA), a joint venture of sorts, so

long as the arrangement was disclosed to borrowers and certain other conditions were

met.  Munson said he would look into the possibility of setting up a CBA with Casa

Linda.

Shortly after this conversation, Munson contacted Anchor's attorney, Kenneth

Michaels, to discuss setting up a CBA with Casa Linda.  Michaels drafted a proposed

agreement.  Munson testified credibly that he signed the draft agreement and sent it to

Busano so that he could have it executed by Casa Linda.  Andy Quiroz, a part owner

and the managing broker of Casa Linda, testified credibly that at some point he saw a

document that he understood as reflecting that Anchor had found a legal way to pay

referral fees to Casa Linda.  Quiroz did not know, however, whether the document had

ever been finalized, though he testified that he did not think Anchor would "engage in

something illegal unless they had found a right way to do it [sic]."  July 9, 2010 Tr. 93.

The evidence reflects that sometime in 1998, Anchor began paying Casa Linda

referral fees for borrowers it referred to Anchor.  The evidence shows that there was no

arrangement in place at the time that would have made the payments permissible

---

[2] Holderby's employment was later terminated.  After that, Busano approached
Casa Linda about keeping its business, and the subject of paying referral fees again
came up.

under HUD/FHA rules.  No fully executed version of the draft CBA exists.  In addition, the draft CBA contemplated the formation of a new entity, but there is no record that this entity was established.  Munson's testimony that he believed a CBA had been set up is uncorroborated and otherwise lacking in credibility.

The referral fees for Casa Linda were paid via Anchor checks, signed by Munson, payable to Busano or Casa Linda.  If the check was made payable to Busano, he would cash the check and pay Casa Linda in currency.   The total amount of payments Anchor made to Casa Linda is unclear.

The documentary evidence admitted at trial reflects three payments that the Court finds constituted referral fees that Anchor paid to Casa Linda.  These are reflected in Government Exhibits 27, 28, and 29.  Exhibits 27 and 28 are checks to Busano dated July 20 and August 20, 1998 that included referral fees for several Casa Linda borrowers.  Busano cashed the checks and made payments to Casa Linda. Exhibit 29 is a check to Casa Linda for dated February 12, 1999 for transactions that apparently took place in January 1999.  The checks were prepared by Anchor's controller, who gave them to Munson for signature.  The materials Munson received along with each check for signature included a spreadsheet referencing Casa Linda Realty that listed the borrowers, loan type (HUD/FHA), loan amount, and the "net commission."  The spreadsheets clearly referenced Casa Linda as a "loan originator" that was receiving a "commission" at a specified rate (three-eighths of one percent).

The government also offered evidence concerning three FHA-insured loans originated by Anchor for buyers referred by Casa Linda Realty.  Government Exhibit 14

concerns a $127,000 loan to Ramon Santiago and Carmen Velez in or about July 2008 for property at 1013 E. Lilac in Palatine, Illinois.  Anchor made the loan as a direct endorser.  The pertinent form included a certification that, among other things, the lender had paid no kickbacks, fee or consideration of any type to anyone in connection with the transaction except as permitted by HUD rules.  Though the copy of the form admitted in evidence was not executed by Anchor, the loan could not have been approved absent Anchor's signature.  It is reasonable to infer, and the Court does infer, that Anchor executed the form, including the certification.  The spreadsheet that accompanied the previously-described August 20, 2008 check to Busano for "Casa Linda reimbursement" listed a commission payment related to a loan to "Santiago" for $127,000.  *See* Govt. Ex. 27.  The Court finds that this was a referral fee for the Santiago loan.

Government Exhibit 15 includes documentation concerning a loan in the amount of $126,150 to Ruben Islas and Tolentino Martiniano for property at 6860 Hickory in Hanover Park, IL.  The loan was direct-endorsed by Anchor and was made in or about late May 1998.  The documentation offered by the government includes a signed certification by Anchor that no kickback, fee, or consideration had been paid to anyone in connection with the transaction except as permitted by HUD rules.  The documentation regarding the previously-described July 20, 1998 check to Busano reflects that the check stub includes a line item of $473.06 for "Ruben Islas."  The accompanying spreadsheet lists a borrower named "Ruben Ligarte" on a loan for $126,150 with a net commission of $473.06.  The next line item on the spreadsheet lists a borrower named "Cecil Islas" on a loan for $93,700 with a commission of

9

$351.38. Though the records are somewhat jumbled, the Court finds that the check included a referral fee to Casa Linda for the Islas loan.

Government Exhibit 16 includes documents regarding a loan in the amount of $114,550 to Miguel Prado and Maria Guzman for property at 7018 Lowell Drive in Carpentersville, Illinois. Anchor direct-endorsed the loan, which was made in or about January 1999. The documentation includes a signed certification by Anchor that no fees had been paid to anyone in connection with the transaction. The spreadsheet accompanying the previously-described February 12, 1999 check to Casa Linda Realty for "January fees" includes a line item for "Miguel Padro [sic]" concerning a loan of $112,050 with a commission of $420.19. Again, though the amounts do not correspond exactly, the Court finds that this check included a referral fee for the Prado loan.

## Discussion[3]

Under the False Claims Act, any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the government for a civil penalty plus three times the damages the government sustains as a result. 31 U.S.C. § 3729(a)(1)(A & B). The government is required to prove a defendant's liability by a preponderance of the evidence. *Id.* § 3731(d).

The term "claim" as used in the FCA means a request or demand for money or property presented to the government or a government contractor. *Id.* § 3729(b)(2).

_____

[3] This section of the decision includes additional findings of fact beyond those made in the section entitled "Facts."

When the government insures a mortgage loan via the FHA, it does not pay out money at that point; indeed, it does not pay out money unless and until a demand is made on the FHA insurance. But an application for FHA insurance nonetheless constitutes a claim within the meaning of the FCA. *See Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123, 2130-31 (2008) (FCA imposes liability for a false statement that has a material effect on the government's eventual decision to pay a claim); *United States v. Eghbal*, 548 F.3d 1281, 1283-84 (9th Cir. 2008) (fraudulent information used to induce government to provide a loan guarantee is a false claim).

The term "knowingly," as used in section 3729(a), denotes actual knowledge, deliberate ignorance or reckless disregard of the truth or falsity of the relevant information. *Id.* § 3729(b)(1). The FCA requires "no proof of specific intent to defraud." *Id.*

## A.     Vicarious liability and imputation of knowledge

The government contends that Anchor is liable on a theory of respondeat superior. A principal is vicariously liable for its agent's conduct if that agent "is an employee who commits a tort while acting within the scope of employment." Restatement (Third) of Agency § 7.03(2)(a) (2006); *see also, United States v. Dolphin Mortgage Corp.,* No. 06 C 499, 2009 WL 153190, at *12 (N.D. Ill. Jan. 22, 2009). Both Busano and Munson were Anchor's agents at the relevant time.

"One fundamental rule of agency law is that corporations 'know' what their employees know – at least, what employees know about subjects that are within the scope of their duties." *Prime Eagle Group Ltd. v. Steel Dynamics, Inc.*, No. 09-1663,

2010 WL 2899097, at *2 (7th Cir. July 27, 2010).  Thus, knowledge that Busano and Munson had about matters within the scope of their responsibilities is imputed to Anchor.  *See Grand Union Co. v. United States*, 696 F.2d 888, 891 (5th Cir. 1983) ("We have held in cases brought under the False Claims Act that the knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment.").  That is the case regarding the matters at issue here – both the false borrower information and referral fee aspects of the government's FCA claim.

The Court rejects Anchor's contention that Busano's acts and knowledge are not attributable to Anchor because, in committing fraud, he acted against the company's interests.  Busano may have been advancing his own interest in obtaining commissions.  But his acts involved authority delegated to him by Anchor – generating, okaying, and submitting loan applications – and he quite clearly was also acting for the benefit of Anchor, which profited from the transactions via the fees and other income it earned when loans were approved.  *See generally* Restatement (Third) of Agency § 7.07 (2006).

**B.    False gift affidavits**

The government contends that Anchor, through Busano, knowingly provided false gift affidavits in connection with applications it submitted to obtain FHA-insured loans for its customers.  The government cites eleven loans, represented in the evidence via Government Exhibits 1-11, as having been approved for FHA insurance based on false gift affidavits.

The portions of Nelson's admissions in plea agreement that the Court admitted in evidence, along with Busano's credible testimony, establish that Anchor engaged in a practice of knowingly submitting to HUD loan applications relating to properties in Poplar Grove, Illinois that contained material false statements concerning the source of the borrowers' down payments. Specifically, Anchor knowingly submitted applications that included gift affidavits that it knew falsely stated the applicant or applicants had received money for the down payment from relatives. In fact, they had received this money from Nelson and/or his companies. Busano knew these gift affidavits were false at the time he caused them to be submitted to HUD/FHA.

These false statements were material to HUD's decision to grant FHA insurance. HUD/FHA rules required the borrower's down payment to be in a particular amount – typically three percent of the loan total – in order for the loan to be eligible for FHA insurance. To the extent Anchor submitted such loan applications to HUD/FHA for approval, it presented or caused the presentment of materially false or fraudulent claims and caused material false statements to be made in connection with false or fraudulent claims. To the extent Anchor approved the loans itself as a direct endorser, it falsely represented to HUD/FHA that the loans met the requirements for FHA insurance.

As the Court has indicated, the government's allegations regarding false gift affidavits concern eleven specific loan applications. In his guilty plea, Nelson stated that each of these applications included false gift affidavits. The loan files the government offered in evidence, however, include gift affidavits for only seven of the eleven loans. Specifically, the loan files for the following seven properties include gift

13

affidavits: 45 King Henry, 115 Chanticleer, 202 Carthage, 213 Constitution, 310 Constitution, 508 Pembroke, and 615 Constitution. The loan files for the following four properties do not include gift affidavits: 133 Lamplighter, 149 Lamplighter, 209 Pembroke, and 400 Pembroke. Though some of the latter files include loan applications that make reference to a portion of the down payment coming from a gift (or from the borrower's own funds), there is no documentary evidence that actually occurred and, more particularly, no corroboration that a false document was actually submitted or a false representation was actually made to obtain an FHA-insured loan.

With one exception, discussed below, Busano was not asked at trial about the circumstances of the particular loans claimed to involve false gift affidavits. Although Nelson stated in his plea agreement that all eleven of the loans included false gift affidavits, his statement, though sworn, was not subject to cross examination. In addition, Nelson's statements were made as part of a plea deal that is fairly described as favorable to him.

Nelson's sworn statements concerning his involvement in providing down payment funds and submitting false gift affidavits are corroborated by Busano's credible testimony at trial in the present case. By contrast, Nelson's statements about particular loan applications are corroborated only to the extent there is documentation or other testimony confirming that particular loans were part of the scheme and course of conduct he described. The Court acknowledges that corroboration is not a legal requirement. Given the circumstances, however, the Court does not find Nelson's statements about particular loans sufficient to sustain the government's claims regarding those loans, absent some corroboration.

14

For these reasons, the Court concludes that the government has sustained its burden of proof regarding the seven loans for which there is documentary evidence of the submission of a gift affidavit: the loans for the properties at 45 King Henry, 115 Chanticleer, 202 Carthage, 213 Constitution, 310 Constitution, 508 Pembroke, and 615 Constitution. The Court likewise concludes that the government has sustained its burden of proof regarding the loan for the property at 209 Pembroke, despite the absence of documentary evidence of a gift affidavit. Busano credibly testified that he saw Nelson give Ella Harris, the purchaser of the 209 Pembroke property, cash for her down payment. Harris's loan application falsely states that the source of her down payment was "sellers [sic] contribution [and] savings." Govt. Ex. 6. The Court can reasonably infer from this, and does infer, that a material false statement was made or submitted to HUD/FHA to obtain FHA insurance on Harris's loan. As for the other three properties, however (133 Lamplighter, 149 Lamplighter, and 400 Pembroke), the government has failed to prove by a preponderance of the evidence that a false gift affidavit or other false statement was made or provided to obtain FHA insurance.[4]

**C.     Kaplan tax returns**

The government also contends that Anchor knowingly submitted false documents to HUD in connection with the Kaplan loan application, which concerned the property at 207 Gable Drive SW in Poplar Grove. Specifically, the government contends that by submitting the Kaplans' amended tax returns or information from them

---

[4] The government's contention that the seller and buyer acknowledged via their signature of the HUD-1 settlement statement that the down payment was legitimate is insufficient to prove the submission of a false statement to HUD/FHA.

in connection with their loan application, Anchor (via Busano) acted with deliberate ignorance or reckless disregard of the truth or falsity of that information.

There is no denying that the circumstances of the Kaplans' loan application are suspicious. The government offered no evidence, however, that the amended tax returns were actually false. For all the Court can say, and for all Busano knew, the original returns were incorrect, and the amended returns were accurate. Absent some evidence – missing here – that the amended tax returns included a false statement, the government cannot sustain its burden of proof regarding this transaction.

The missing evidence is not supplied by the statement in Nelson's plea agreement that he caused false information to be submitted in connection with the 207 Gable Drive transactions. Nelson's plea agreement says only that "other false statements" were submitted in connection with that transaction; it says nothing about the tax returns. In any event, any knowledge Nelson may have had regarding the falsity of statements concerning this transaction cannot be imputed to Anchor, because Nelson was not Anchor's agent.

For these reasons, the Court concludes that the government has failed to sustain its burden of proof with regard to the 207 Gable Drive transaction.

## D.     Casa Linda Realty referral fees

As a direct endorser, Anchor was responsible for ensuring that FHA mortgage insurance applications complied with HUD regulations, guidelines and forms. *See* Govt. Ex. 23, Single Family Direct Endorsement Program, § 4000.4, ¶ 3-16 ("The underwriter is responsible for the quality of decisions made by the mortgagee under the

program.  For endorsement purposes, the department relies upon certifications by the

mortgagee and the mortgagee's underwriter that the mortgage loan complies with HUD

regulations and underwriting instructions.").  In addition, in submitting direct-endorsed

loans to HUD for approval, Anchor certified that it had paid no kickbacks, fees, or other

consideration to any party in connection with the transaction except as permitted by

HUD regulations.  *See, e.g.,* Govt. Ex. 14 (lender's certificate).  In the same document,

Anchor also made "all certifications required for this mortgage as set forth in HUD

Handbook 4004.4," *id.*, which includes the requirement that the loan comply with HUD

rules.

The government's FCA claim regarding the three Casa Linda loans is premised

on defendants' allegedly false representation that the loans complied with HUD

regulations and that no improper fees had been paid to any party in connection with the

transactions.  Under HUD regulations, "[n]o person shall give and no person shall

accept any fee, kickback or other thing of value pursuant to any agreement or

understanding, oral or otherwise, that business incident to or part of a settlement

service involving a federally related mortgage loan shall be referred to any person."  24

C.F.R. § 3500.14(b).  The HUD handbook concerning FHA insured loans also provides

that "[a] mortgagee is not permitted to pay any fee, compensation, or thing of value:  . . .

that is a kickback . . . [or] [t]o any party for referring the loan (a 'finder's fee')," among

other things.  *See* Govt. Ex. 22, § 4000.2, ¶ 5-5.  The handbook also states that any

payment "[t]hat is prohibited by the Real Estate Settlement Procedures Act (RESPA)" is

barred.  *Id.*  RESPA prohibits "any fee, kickback, or thing of value pursuant to any

agreement . . . that business incident to . . . a real estate settlement service involving a

federally related mortgage loan shall be referred to any person."  12 U.S.C. § 2607(a).

RESPA and HUD regulations provided at the relevant time that certain specific types of payments were permitted, as exceptions to the general rules quoted above. *See* 12 U.S.C. § 2607(c); 24 C.F.R. § 3500.14(g).  Only a few of these exceptions conceivably might apply.  Defendants have suggested that Anchor was paying Casa Linda for services performed.  *See* 12 U.S.C. § 2607(c)(1)(C) & (2); 24 C.F.R. § 3500.14(g)(1)(iii-iv).  The Court rejects this contention.  Busano and Quiroz both testified credibly that the payments were compensation for referrals, not for services rendered.  And the spreadsheets that Anchor personnel prepared described the payments as "commissions" to Casa Linda as a "loan originator."

RESPA also permits "payments pursuant to cooperative brokerage and referral arrangement or agreements between real estate agents and brokers."  12 U.S.C. § 2607(c)(3); 24 C.F.R. § 3500.14(g)(1)(v).  This exception, however, applies only to fee divisions among real estate brokers, not to "any fee arrangements between real estate brokers and mortgage brokers," which is the situation here.  24 C.F.R. § 3500.14(g)(1)(v).

The only other potentially applicable exception concerns payments pursuant to what RESPA and HUD regulations call "affiliated business arrangements," which the Court understands to be the type of understanding the parties have referred to as a "controlled business arrangement" or CBA.[5]  *See* 12 U.S.C. § 2607(c)(4); 24 C.F.R. § 3500.15.  RESPA defines an affiliated business arrangement as an arrangement in

_____

[5] RESPA was amended in 1996 to incorporate this change in terminology.

which a person in a position to refer business in connection with the making or settlement of federally related loan, or an associate of such a person, "has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services."  12 U.S.C. § 2602(a)(7).  (The term "settlement services" includes, among other things, real estate brokerage services, origination of federally related mortgage loans, and loan processing.  *See id.* § 2607(a)(3).)

Both RESPA and HUD regulations, however, tightly control how affiliated business arrangements must work in order for RESPA's exception to apply.  First, RESPA contains detailed disclosure requirements.  *See* 12 U.S.C. § 2607(c)(4)(A-C).  Second, HUD regulations set additional, detailed conditions for compliance.  Among other things, the only thing of value that may be received from the arrangement (apart from payments provided under other RESPA exceptions that do not apply here) "is a return on an ownership interest or franchise relationship."  24 C.F.R. § 3500.15(b)(3).  That gibes with the testimony at trial that Munson and Casa Linda contemplated setting up a separate joint entity, to which any referral fees presumably would be paid.  Anchor and Casa Linda, as the owners of that entity, could then obtain, consistent with HUD regulations, a return on their ownership interest.

That, however, is not what happened.  First, the evidence shows that the contemplated separate entity was never formed.  Second, the payments were nothing like a "return on an ownership interest"; rather, they were commissions that were paid based on a set percentage of the amount of the home buyer's loan.

To summarize, Anchor made payments to Casa Linda, as shown by the credible testimony of Busano and Quiroz and the three checks and supporting spreadsheets that were admitted in evidence. The same evidence shows these payments were referral fees, not some other sort of payment. In particular, Anchor paid Casa Linda referral fees in connection with the three Casa Linda-related loans at issue in this case.

Munson authorized paying referral fees to Casa Linda. Busano so testified, and that testimony was credible. It stands to reason that no middle manager like Busano would have okayed paying such fees without Munson's authorization. This is particularly so in light of the fact that Busano had previously discussed with Munson the idea of paying referral fees to Casa Linda as a means of keeping this significant source of business.

The referral fees that Anchor paid to Casa Linda were improper and impermissible under RESPA and HUD rules. Anchor (via Munson) may have taken steps toward the establishment of an affiliated business arrangement that, if put in place and carried out properly, conceivably might have made the payments proper. But the evidence shows they neither finalized that arrangement nor carried it out in the way the law required. Despite this, Munson authorized and Anchor paid Casa Linda fees for referring customers.

The government has proven that Anchor falsely certified to HUD that it had paid no improper referral fees. Anchor made both an express certification to this effect via the form that accompanied the direct-endorsed loans and an implied certification via the form's catch-all language stating that it was making all the certifications required by

20

section 4000.4 of the HUD Handbook.

Defendants contend that the false certifications were immaterial and did not cause HUD's alleged loss on these loans. The Court agrees with the government, however, that it has established both materiality and causation in connection with the Casa Linda referral fees. The evidence shows that HUD would not have approved the relevant FHA mortgage insurance applications had it known improper referral fees were being paid. *See, e.g., United States v. Rogan,* 517 F.3d 449, 542-53 (7th Cir. 2008); *Dolphin Mortgage,* 2009 WL 153190, at *10-12; *see also* Gov't. Ex. 23, § 4000.4, ¶ 1-3 ("If at the time the case is submitted for endorsement HUD has evidence that there is fraud or misrepresentation on the part of the originating mortgagee, HUD will consider the certifications as fraudulent and will not endorse the mortgage for insurance.").

The government has also proven that Anchor knowingly made the false certifications. Busano testified credibly that he knew that Anchor could pay Casa Linda referral fees only if a CBA[6] was established. He also testified credibly that he did not know whether a CBA was ever actually put into place. And, as the Court has found, no CBA was ever concluded. Yet at some point, Busano began making referral fee payments to Casa Linda, after Munson had authorized him to do so, to obtain and keep Casa Linda's business. Busano made these payments in what was at least reckless disregard of their illegality. In addition, with at least the same level of intent, Busano caused Anchor to make the previously-referenced false certifications to HUD. Busano's knowledge and intent are attributable to Anchor for purposes of FCA liability.

---

[6] The Court uses this term to include what RESPA and HUD rules refer to as an affiliated business arrangement.

The government also contends that Munson is personally liable with regard to the Casa Linda-related false claims.  Munson knew, or at least recklessly disregarded, that no CBA had been concluded with Casa Linda.  Thus Munson's liability under the FCA largely turns on whether he knew at the relevant time that referral fees were being paid to Casa Linda.

Munson signed each of the three checks that the Court has found represented illegal referral fees to Casa Linda.  The first and second checks were payable to Busano; the third was payable directly to Casa Linda.

The Court cannot say that the first two checks in and of themselves provided Munson with information sufficient for a finding that he knew, deliberately ignored, or recklessly disregarded the purpose of those payments.  The spreadsheets that accompanied each of those checks when Munson signed them, however, clearly showed that "commissions" – referral fees – were being paid to Casa Linda as "loan originator."  Munson testified that he did not review the spreadsheets and that the checks were presented to him along with numerous other checks for signature.  That may mean that Munson did not have actual knowledge that the checks represented referral fees.  The Court finds, however, that Munson deliberately ignored or recklessly disregarded the truth – in short, he put his head in the sand.  As the person responsible for setting the terms of Anchor's arrangement with Casa Linda, Munson knew that no CBA had been concluded and that payments to Casa Linda for referrals were improper.  Munson also quite clearly knew that Anchor was making loans to customers referred by Casa Linda.  It is equally clear that documents (the spreadsheets) were placed before him showing that improper payments were being made to Casa Linda.

In sum, the government has shown by a preponderance of the evidence that Munson had the requisite knowledge regarding the payments. Because Munson knew Anchor was submitting direct-endorsed loans to HUD relating to the Casa Linda properties, he likewise had the requisite knowledge that false statements and certifications were being made to obtain HUD's approval for FHA insurance. Because Busano credibly testified that Munson had authorized him to pay the referral fees even though they were legally improper, the evidence also establishes that Munson caused the false certifications to be made.

The evidence is even stronger regarding the third payment, as to which the face of Anchor's check showed that money was being paid to Casa Linda. The Court rejects defendants' argument that Munson and Anchor lacked knowledge because no one in his right mind would make an improper payment via a check. It is not at all unusual for laws to be knowingly violated in a way that makes later detection simple. The FCA does not require proof of deviousness or that the claimant tried to avoid detection.

**D.     Damages**

The FCA provides that any person who violates the act is subject to a civil penalty of between $5,500 and $11,000 per false claim, "plus [three] times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9). The government's damages are trebled "before any deduction is made for payments previously received from any source in mitigation of those damages." *United States v. Bornstein,* 423 U.S. 303, 316 (1976).

The government requests, and the Court will award, the minimum civil penalty

23

per claim of $5,500. The Court has found Anchor liable with regard to eleven claims and thus imposes civil penalties on Anchor in the amount of $60,500. The Court imposes on Munson civil penalties of $16,500, representing the three false Casa Linda claims.

The government's actual damages are calculated based on the losses it suffered in connection with the following loan applications: 45 King Henry; 115 Chanticleer; 202 Carthage; 209 Carthage; 213 Constitution; 310 Constitution; 508 Pembroke; 615 Constitution; 1013 Lilac; 6860 Hickory; and 7018 Lowell. The following table represents the government's total losses for these properties. The table also includes the price at which the government sold each property.

| Property Address and FHA No. | Total Loss | Sale Price |
|---|---|---|
| 45 King Henry Dr., Poplar Grove, IL | $131,643.05 | ($68,200.00) |
| 115 Chanticleer, Poplar Grove, IL | $151,983.17 | ($109,200.00) |
| 202 Carthage Ct., Poplar Grove, IL | $40,370.31 | N/A |
| 209 Pembroke, Poplar Grove, IL | $155,416.49 | ($85,000.00) |
| 213 Constitution, Poplar Grove, IL | $133,022.70 | ($69,400.00) |
| 310 Constitution, Poplar Grove, IL | $135,118.15 | ($70,305.00) |
| 508 Pembroke, Poplar Grove, IL | $135,679.07 | ($72,000.00) |
| 615 Constitution, Poplar Grove, IL | $129,204.65 | ($67,115.00) |
| 1013 E. Lilac, Palatine, IL | $10,624.14 | N/A |
| 6860 Hickory, Hanover Park, IL | $23,051.84 | N/A |
| 7018 Lowell Dr., Carpentersville, IL | $36,298.88 | N/A |
| **Totals** | $1,082,412.45 | ($541,220.00) |

The government's total loss relating to all of these properties amounts to $1,082,412.15. Trebling these losses is mandatory under the FCA, and the trebling occurs before taking into account amounts the government later recovered. *See Bornstein*, 423 U.S. at 316; *see also* 31 U.S.C. § 3729(1). Three times the government's total loss is $3,247,237.35. Deduction of $541,220.00 for the amount later recovered by the government results in a total damage award against Anchor of $2,706,017.35. When civil penalties are added, the total is $2,766,517.35.

The government's damages arising from the three properties on which the Court has found Munson individually liable – the last three properties on the list above – total $69,974.86. Three times this amount is $209,924.58. When civil penalties are added, the total is $226,424.58.

The evidence shows that Munson contacted HUD and the FBI to report that Casa Linda had falsified loan documents. Defendants appear to argue that this entitles them to a reduction of damages. *See* 31 U.S.C. § 3729(a)(2). The Court disagrees. Though Munson quite clearly reported some wrongdoing, he did not report the violations involved in this case. Defendants cite no authority for the proposition that the FCA's reduced damages provision applies if a person reports one violation but the FCA suit is based on a separate violation that may have been uncovered following the party's self-reporting.[7]

## Conclusion

---

[7] To the extent defendants are arguing that Munson's reporting of a separate violation reflects a lack of the intent required for liability under the FCA, the Court rejects the contention.

The Court directs the Clerk to enter judgment in favor of the plaintiff and against both defendants on Count 1 of the complaint, and in favor of both defendants and against the plaintiff on Counts 2 and 3.  The court awards the plaintiff damages and penalties in the amount of $2,766,517.35 against defendant Anchor Mortgage Corp. and in the amount of $226,424.58 against defendant John Munson.  The liability of the defendants is joint and several.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 11, 2010